IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

MAY 8 2018

CLERK U.S. DISTRICT COURT
ALEXANDRIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:18-cr-89 (TSE) |
| | ) | |
| v. | ) | COUNT ONE: 18 U.S.C. § 794(a) & (c) |
| | ) | Conspiracy to Gather or Deliver Defense |
| JERRY CHUN SHING LEE, | ) | Information to Aid a Foreign Government |
| | ) | |
| | ) | COUNT TWO: 18 U.S.C. § 793(e) |
| Defendant. | ) | Unlawful Retention of National Defense |
| | ) | Information |
| | ) | |
| | ) | COUNT THREE: 18 U.S.C. § 793(e) |
| | ) | Unlawful Retention of National Defense |
| | ) | Information |

INDICTMENT

MAY 2018 TERM -- At Alexandria

**THE GRAND JURY CHARGES THAT:**

At all times material to this Indictment, except as otherwise indicated:

### GENERAL ALLEGATIONS

**The Defendant**

1. Jerry Chun Shing Lee ("LEE") is a naturalized United States citizen who resided in Hong Kong. He was born in Hong Kong but grew up in Hawaii. LEE served in the U.S. Army from 1982 to 1986. He graduated from Hawaii Pacific University in 1992 with a bachelor's degree in International Business Management, and in 1993 he received a master's degree in Human Resource Management. LEE entered duty with the Central Intelligence Agency ("CIA") in 1994.

2. In 2007, LEE was assigned as a CIA case officer overseas. His primary duty was to maintain contact with foreign officials.

3. In July 2007, LEE resigned from the CIA.

4. In July 2007, LEE resided in Hong Kong and began working for a large international tobacco company. He was terminated from that company in June 2009 but continued to receive payments from it until May 2010.

5. In June 2010, LEE and an associate registered a business, FTM International ("FTM"), in Hong Kong. FTM's stated purpose was to facilitate the import of cigarettes into China by serving as an intermediary between foreign tobacco companies and China's State Tobacco Monopoly Administration.

6. FTM was not financially successful. By in or about December 2011, LEE sold his stake in FTM to his business associate.

### Chinese Intelligence Services and Associated Terms

7. The People's Republic of China ("PRC") intelligence services encompassed both the civilian and military components of Chinese intelligence programs. The PRC's Ministry of State Security ("MSS") handled civilian intelligence collection and was responsible for counter-intelligence and foreign intelligence, as well as political security. The MSS consisted of a central ministry, provincial state security departments, and municipal state security bureaus.

8. Among other things, the MSS and its regional bureaus focused on identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus sought to obtain information on political, economic, and security policies that might affect the PRC, foreign intelligence operations directed at the PRC, and biographical profiles of foreign politicians and intelligence officers ("IOs").

9. Additionally, the MSS and its bureaus were tasked with conducting clandestine and overt human source operations, of which the United States was a principal target. These operations used trained IOs, as well as non-professional collectors.

10. Unindicted co-conspirators 1 and 2 ("CC#1" and "CC#2") are residents of the PRC and were known to LEE to be IOs with the MSS.

**The CIA**

11. The CIA was a U.S. government intelligence agency with various offices and facilities, and was a component of the United States Intelligence Community ("USIC"). The CIA's primary facility and headquarters were in the Eastern District of Virginia. The CIA was responsible for, among other things, collecting (including through clandestine means), producing, and disseminating foreign intelligence and counterintelligence used to inform U.S. policy-makers; conducting counterintelligence activities; conducting administrative and technical support activities; conducting covert action activities approved by the President; and conducting foreign liaison relationships with intelligence and security services of foreign governments. The collection of foreign intelligence is, in part, done through the use of sources or assets. Sources or assets are people who agree to help a foreign intelligence service by providing information to that service in response to taskings from foreign intelligence officers or agents.

12. During his time at the CIA, LEE served as a case officer. A case officer's primary mission is to recruit clandestine human intelligence sources. As a CIA case officer, LEE had access to the identities of covert CIA officers; the identities of clandestine human sources; details of sensitive intelligence collection operations and methods; details of CIA clandestine training; and details of clandestine tradecraft the Agency employs to avoid detection by hostile foreign intelligence services. As a CIA case officer, LEE was trained in methods of covert

3

communication, surveillance detection, and operational security, for purposes of conducting authorized intelligence activities for the United States. The same methods in which LEE was trained could be employed against the United States.

### Classified Information

13. Pursuant to Executive Order 12958 signed on April 17, 1995, as amended by Executive Order 13292 on March 25, 2003, and Executive Order 13526 on December 29, 2009, national security information was classified as "TOP SECRET," "SECRET," or "CONFIDENTIAL." National security information was information owned by, produced by, produced for, and under the control of the United States government that was classified as follows:

    a. Information was classified as TOP SECRET if the unauthorized disclosure of that information reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority was able to identify and describe.

    b. Information was classified as SECRET if the unauthorized disclosure of that information reasonably could be expected to cause serious damage to the national security that the original classification authority was able to identify and describe.

    c. Information was classified as CONFIDENTIAL if the unauthorized disclosure of that information reasonably could be expected to cause damage to the national security that the original classification authority was able to identify and describe.

14. Access to national security information classified at any level could be further restricted through compartmentation in Sensitive Compartmented Information ("SCI") categories. Only individuals with the appropriate security clearance and additional SCI permissions could have authorized access to such classified national security information.

15. Information classified at any level could only be lawfully accessed by persons determined by an appropriate United States government official to be eligible for access to classified information, who had signed an approved non-disclosure agreement, who received a

security clearance, and who had a "need to know" the classified information. Classified information could only be stored in an approved facility and container.

### LEE's U.S. Government Security Clearances

16. In the course of LEE's employment with the CIA, he served in various overseas positions and locations, all of which required a Top Secret clearance. In addition to his Top Secret clearance, LEE maintained SCI access to various sensitive programs.

17. Because LEE held a security clearance, the U.S. government entrusted him with access to sensitive government materials, including classified documents and materials and information relating to the national defense that was closely held by the government.

18. Throughout his career, as a prerequisite to his access to classified information, LEE signed numerous non-disclosure forms in which he acknowledged both the harm that could result from the unauthorized disclosure of classified information and the applicability of criminal sanctions, including Title 18, United States Code, Sections 793 and 794, should LEE make unauthorized disclosures of such information.

19. On or about July 13, 2007, prior to leaving government service, LEE signed a CIA security exit form that contained the following language: "I give my assurance that there is no classified material in my possession, custody, or control at this time." LEE's security clearance was terminated upon his departure from government service.

## COUNT ONE

### CONSPIRACY TO GATHER OR DELIVER DEFENSE INFORMATION TO AID A FOREIGN GOVERNMENT

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1-19 of the General Allegations section of this Indictment are incorporated by reference and re-alleged as though set forth fully herein.

2. From on or about April 26, 2010 to on or about January 15, 2018, in the Eastern District of Virginia and elsewhere, including locations outside of the jurisdiction of any particular state or district, defendant JERRY CHUN SHING LEE did unlawfully and knowingly conspire with others, known and unknown to the grand jury, to communicate, deliver, and transmit to a foreign government, to wit: the Government of the People's Republic of China, and representatives, officers, and agents thereof, directly and indirectly, documents, writings and information relating to the national defense of the United States, with the intent and reason to believe that such documents, writings and information were to be used to the injury of the United States and to the advantage of a foreign government, namely, the Government of the People's Republic of China.

**MANNER AND MEANS OF THE CONSPIRACY**

A. It was a part of the conspiracy that LEE would agree to transfer, and attempt to transfer, to others, whom he believed to be IOs of the PRC, documents and information relating to the national defense of the United States, in exchange for money.

B. It was further a part of the conspiracy that the IOs would provide LEE with email accounts, phone numbers, and other means of communication by which they could communicate covertly with LEE in furtherance of their agreement for him to provide them with documents and information relating to the national defense of the United States.

6

C. It was further a part of the conspiracy that, over time, the IOs would send LEE numerous envelopes containing written taskings for him to carry out in exchange for money.

D. It was further a part of the conspiracy that the written taskings requested that LEE provide documents and information relating to the national defense of the United States.

## OVERT ACTS

In furtherance of the said conspiracy and to effect the objects thereof, the defendant and other conspirators committed the following overt acts in the Eastern District of Virginia and elsewhere, including, but not limited, to the following:

1. On or around April 26, 2010, in Shenzhen, China, CC#1 and CC#2 met with LEE. CC#1 and CC#2, who both spoke fluent Cantonese, said that they were aware of LEE's background and that they were in the same professional field. LEE understood that to mean they were Chinese IOs. CC#1 and CC#2 told LEE that they had prepared a gift of $100,000 cash in exchange for his cooperation and that they would take care of him for life.

2. On or about May 11, 2010, while overseas, LEE met with a CIA officer and reported that the IOs had approached him. However, LEE did not reveal the IOs' offer of a $100,000 gift or the offer to take care of him for life.

3. Sometime in or about May 2010, LEE began receiving a series of written taskings from the IOs. The taskings were contained in envelopes that LEE's business associate delivered to LEE. Some of the envelopes were accompanied by gifts for LEE. The majority of the taskings asked LEE to reveal sensitive information about the CIA, including national defense information. The IOs requested at least 21 different pieces of information from LEE. The taskings continued into at least 2011.

4. On or about May 14, 2010, LEE made or caused to be made into one of his personal HSBC Bank accounts in Hong Kong a cash deposit of $138,000 HKD (approximately $17,468 USD). This would be the first of hundreds of thousands of dollars (USD equivalent) in cash deposits LEE made or caused to be made into his personal HSBC accounts from this date through December 2013.

5. On or about May 26, 2010, in Hong Kong, in response to two taskings LEE received from the IOs, LEE created on his laptop computer a document that included entries pertaining to certain locations to which the CIA would assign officers and a particular location of a sensitive operation to which the CIA would assign officers with certain identified experience. It was later determined that information LEE included in this document was national defense information of the United States that was classified at the Secret level.

6. Sometime in or about the summer of 2010, in response to a tasking from the IOs, LEE drew a sketch of the floor plan of a particular CIA facility located abroad.

7. On or about July 12, 2010, LEE sent an email to his business associate, asking, "Any meeting with our friends in China?" The business associate replied, "No any [sic] call from the Chinese friends yet. . . . Have you heard anything from the friends?" LEE then replied, "That's OK if no action is taken at this time. In the meantime, I will maintain contact with our friends."

8. On or about July 13, 2010, the business associate emailed LEE and stated that he had received a call from CC#2, who advised that CC#1 would be coming to Hong Kong soon and would want to visit the business associate and LEE to "discuss the further arrangement of the meeting before the meeting date." LEE responded, "Good news indeed."

8

9. On or about March 8, 2012, in McLean, Virginia, during an interview for reemployment LEE was seeking with the CIA, LEE falsely stated that he had not traveled to China for approximately two years.

10. On or about April 22, 2012, an email account that included one of LEE's daughter's names in the address was created from an IP address that resolved to Guangzhou, China. This email address was one of several email addresses provided to LEE by the IOs so that he could communicate covertly with them.

11. Beginning on or about June 4, 2012, and continuing until on or about June 8, 2012, in McLean, Virginia, LEE had additional interviews for re-employment with the CIA. During these interviews, LEE provided the CIA with a falsified bank statement that falsely showed that, as of April 30, 2012, FTM had approximately $2,078,146.64 HKD in its HSBC bank account when, in fact, the account had approximately $78,146.64 HKD. Lee falsely claimed that FTM was profitable when, in fact, it was losing money. Lee also continued to falsely claim that he had not traveled to China since the IOs contacted him.

12. On or about June 6, 2012, in Vienna, Virginia, LEE possessed in his hotel room a piece of stationary containing a hand-written phone number provided to him by the IOs, as well as an abbreviated version of the email address described above in Overt Act 10.

13. In or about July 2012, LEE traveled to Guangzhou, China.

14. From on or about August 10, 2012 to on or about August 15, 2012, LEE traveled from Hong Kong to Fairfax, Virginia, with a layover in Honolulu, Hawaii. During this trip, LEE possessed the following in his luggage:

(a) Two notebooks containing his hand-written notes pertaining to, among other things, CIA-related operational notes from asset meetings, operational meeting locations, operational phone numbers, true names of assets, and information about covert facilities. It was later determined that LEE's entries in these two books

9

contained Top Secret and Secret national defense information of the United States;

(b) An electronic storage device, commonly known as a thumb drive, containing in the unallocated space of the device the classified document described above in Overt Act 5 that LEE had created on his laptop on May 26, 2010; and

(c) The same piece of stationary described above in Overt Act 12, with the handwritten addition of a second phone number that had been provided to him by the IOs.

15. Beginning on or about December 3, 2012, and continuing until on or about December 7, 2012, in Falls Church, Virginia, LEE had additional interviews for re-employment with the CIA. During these interviews, LEE falsely claimed that he had not traveled back to China since April 2010.

16. On or about February 9, 2013, an email was sent from the email account described above in Overt Act 10 to the same account. The subject of the email was "How's christina?" The message read:

"Long time no see, How's christina's grade book ?

We have not seen her recent grade book for a few months,maybe [sic] little girl always like changing her mind."

17. On or about May 30, 2013, two persons met with a former CIA employee ("Cooperating Witness" or "CW#1") outside of the United States. The two persons informed CW#1, in sum and substance, that they were in the same line of work as she and did what she used to do. CW#1 understood this to mean that they were Chinese IOs. Among other things, the two IOs asked CW#1 about locations where she had worked and assets she had handled on behalf of the CIA. LEE had access to information about CW#1's activities while with the CIA, and the IOs had tasked him with providing information about CW#1, among other things.

18. On or about May 22, 2013, in an interview with Special Agents of the FBI, in Washington, D.C., when shown the document described above in Overt Act 5, LEE confirmed

that the document contained CIA information but falsely denied creating the document or knowing who did.

19. On or about January 15, 2018, in an interview with Special Agents of the FBI, in Queens, New York, LEE falsely denied that he ever kept any work-related notes at home. When shown a photocopy of the front covers of the notebooks described above in Overt Act 14(a), as well as a copy of LEE's handwriting contained therein, LEE falsely denied that he possessed the notebooks in Hawaii during the August 2012 layover. LEE falsely denied that either of the books contained notes from asset meetings but conceded that any such notes would be classified. LEE also falsely denied that he ever put the document described above in Overt Act 5 on a thumb drive after he created the document on his laptop computer.

(In violation of Title 18, United States Code, Section 794(a) & (c))

## COUNT TWO

### UNLAWFUL RETENTION OF NATIONAL DEFENSE INFORMATION

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1-19 of the General Allegations section of this Indictment are incorporated by reference and re-alleged as though set forth fully herein.

2. On or about August 15, 2012, in Fairfax, Virginia, within the Eastern District of Virginia, defendant JERRY CHUN SHING LEE, having unauthorized possession of, access to, and control over documents, writings, and notes relating to the national defense, to wit: a 2002 Day Planner containing handwritten, classified information up to the Top Secret level pertaining to, but not limited to, operational notes from asset meetings, operational meeting locations, operational phone numbers, the true names of assets, and covert CIA facilities, did unlawfully, knowingly and willfully retain the same and fail to deliver them to the officer or employee of the United States entitled to receive them.

(In violation of Title 18, United States Code, Section 793(e))

COUNT THREE

UNLAWFUL RETENTION OF NATIONAL DEFENSE INFORMATION

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1-19 of the General Allegations section of this Indictment are incorporated by reference and re-alleged as though set forth fully herein.

2. On or about August 15, 2012, in Fairfax, Virginia, within the Eastern District of Virginia, defendant JERRY CHUN SHING LEE, having unauthorized possession of, access to, and control over documents, writings, and notes relating to the national defense, to wit: an address book containing handwritten, classified information up to the Secret level pertaining to, but not limited to, the true names and phone numbers of assets and covert CIA employees, as well as the addresses of CIA facilities, did unlawfully, knowingly and willfully retain the same and fail to deliver them to the officer or employee of the United States entitled to receive them.

(In violation of Title 18, United States Code, Section 793(e))

A TRUE BILL Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

_____
FOREPERSON OF THE GRAND JURY

Tracy Doherty-McCormick
Acting United States Attorney

By: _____
W. Neil Hammerstrom, Jr.
Assistant United States Attorney

_____
Patrick Murphy
Trial Attorney
U.S. Department of Justice

_____
Adam Small
Trial Attorney
U.S. Department of Justice