IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:18-cr-89 (TSE) |
| | ) | |
| JERRY CHUN SHING LEE, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S POSITION WITH RESPECT TO SENTENCING

The United States, by and through its undersigned counsel, hereby files its position on

sentencing.  The United States has no objections to and does not dispute any facts or factors

material to sentencing in the presentence report ("PSR").  For his own pecuniary benefit, the

defendant betrayed promises he made to the United States, the Central Intelligence Agency

("CIA"), and, most importantly, the human assets he handled.  In exchange for conspiring with

intelligence officers ("IOs") of the People's Republic of China ("PRC") and providing them with

sensitive national defense information ("NDI"), the defendant received over $840,000.  When

questioned about his conduct, the defendant repeatedly and egregiously lied to investigators from

the CIA and the Federal Bureau of Investigation ("FBI").  Only days before trial did the

defendant accept responsibility for his conduct.  A significant sentence within the recommended

guidelines range of 262–327 months is necessary and appropriate in this case.

## I.     BACKGROUND

This case is about a former CIA case officer who violated his oath of office and put our

nation's security at risk by conspiring to provide PRC IOs with highly sensitive NDI.  From

1994 to 2007, the defendant worked for the CIA as a case officer.  The defendant did work for

1

the CIA in a variety of overseas locations, including China.  He also underwent advanced

training.  As a case officer, the defendant had firsthand knowledge of some of the CIA's most

significant secrets, from the location of operations to counterintelligence techniques to the

identities of clandestine human sources and the identities of covert CIA officers.

The defendant resigned from the CIA in July 2007.  After resigning, he briefly worked in

Hong Kong for Japan Tobacco International ("JTI"), a large international tobacco company.  In

2009, JTI terminated the defendant, and he began to form a consulting business, Foreign

Tobacco Management ("FTM") with a JTI associate.  The defendant knew that this business

associate, who was a former Hong Kong Special Branch Police Detective, also had close ties to

the PRC's Ministry of State Security ("MSS").

At the same time that the defendant was forming FTM, he re-applied to the CIA from

Hong Kong.  Approximately two weeks later, the defendant agreed to attend a private dinner in

Shenzhen, China with his business associate and a PRC IO who was a mutual acquaintance.

During the dinner, two other PRC IOs (an older and younger man who both identified

themselves as "Mr. Li") excused the business associate and the mutual acquaintance.  The Lis

then made it clear that they were familiar with the defendant and his work for the CIA, including

work he had done for the CIA in China.  The Lis offered the defendant a cash gift of $100,000

and a cellular telephone to communicate with them.  Commensurate with an anticipated long-

term relationship, they offered to take care of the defendant "for life."

On May 14, 2010, the defendant made or caused to be made into his personal bank

account in Hong Kong a cash deposit of $138,000 HKD (approximately $17,468 USD).  This

would be the first of hundreds of thousands of dollars in cash deposits into the defendant's

personal account from this date through December 2013.  In total, the defendant made 68

separate cash deposits amounting to over $840,000 during this time period.

Beginning in or about May 2010, the defendant began receiving requests for information

(taskings) from the Lis.  On May 26, 2010, the defendant created on his laptop a document that

contained NDI related to the CIA.  Among other things, the document described locations to

which the CIA assigned officers with certain experience as well as the location of a sensitive

CIA operation.  This information was classified at the SECRET level.  After the defendant

created this document, he transferred it on an unknown date from his laptop to a thumb drive.

Sometime in or about the summer of 2010, in response to a tasking from the Lis, the defendant

drew a sketch of the floor plan of a particular CIA facility, which was located abroad but no

longer in use.  He later told the FBI he tore up the sketch and never provided it to the Lis.

In March and June 2012, the defendant traveled to the United States to be interviewed by

the CIA in conjunction with his application for rehire.  During these interviews, he made

numerous false statements to conceal the conspiracy and obstruct the investigation.  Among

other things, he lied about the true nature of his relationship with the Lis.  He said that he met

them at a conference and that they had not offered him any money.  The defendant also denied

receiving specific requests for information from the Lis and said that he had not traveled to

mainland China to meet with them.  The defendant falsely told former colleagues and CIA

interviewers that FTM was a success and that he was earning hundreds of thousands of dollars.

During one of the interviews, the defendant presented the CIA with a falsified bank statement

from FTM's business account.  The statement falsely showed that the company had millions of

HKD in this account.  In fact, FTM had *de minimis* legitimate income, and the defendant sold his

stake to his business associate for the nominal price of $1 HKD per share.

In July 2012, to better his chances of being rehired by the CIA, the defendant relocated

from Hong Kong to the United States.  While the defendant transited through Hawaii, the FBI

conducted a court-authorized search of his personal luggage.  That search revealed that the

defendant possessed the thumb drive described above as well as a 2002 Day Planner and an

address book with handwritten notes, the preponderance of which related to his work as a CIA

case officer prior to 2004.  The notes included, among other things, intelligence provided by CIA

clandestine human sources, true names of CIA clandestine human sources, operational meeting

locations and phone numbers, and information about covert facilities.  In short, the notebooks

reveal the daily contacts, patterns, and professional interests of a CIA case officer.  The

information would have been of immense value to the PRC IOs.

In December 2012, the defendant had additional interviews with the CIA.  One of the

interviewers confronted the defendant with numerous inconsistencies in his story and asked him

to write a narrative account of his encounter with the Lis.  The defendant then wrote and

submitted a two-page document to the CIA.  The defendant's narrative falsely stated that the Lis

had approached him at a conference and that he had quickly rebuffed them.  The narrative

omitted critical inculpatory facts, including that the defendant had received taskings from the

Lis; that he had undertaken actions that were responsive to at least some of the taskings; and that

he had subsequent contact with the Lis, whether through his business associate or directly with

the Lis.

While the defendant sought reemployment with the CIA, the Lis sought to maintain

contact with him.  In April 2012, a Yahoo! email account was created from an Internet Protocol

("IP") address that resolved to Guangzhou, China.  The account's user name related to one of the

defendant's close family members.  During a later interview with the FBI, the defendant

admitted receiving several accounts from the Lis but claimed that he could only remember this account.  IP logs reveal that the account was logged into approximately once per month—almost entirely from mainland China—until December 2012, when the account was logged into eight times.  The next month, January 2013, the account was logged into nine times.  From this pattern, it appears that the Lis were expecting to receive news from the defendant, possibly regarding his efforts to be rehired by the CIA.  The next month, the account posted a message to itself.  The message read:

> Long time no see, How's christina's grade book?
>
> We have not seen her recent grade book for a few months,maybe [sic] little girl always like changing her mind.

The obvious import of this message, and the pattern of IP logins in the preceding months, is that the Lis were expecting to hear from the defendant and were frustrated that he had not contacted them.  It is a reasonable inference that the defendant had not contacted the Lis because he had not been rehired and also because he was wary of being surveilled.

During a series of interviews with FBI agents in May 2013, the defendant initially claimed that this message was a reference to his daughter's grades.  When challenged by the interviewing agents, Lee claimed that the message could have been an attempt by the Lis to have him contact them.  During these interviews, the defendant also admitted that he received at least 21 taskings for information from the IOs.  These taskings required the defendant to disclose, *inter alia*, the names of CIA employees, methods the CIA uses to communicate, and overseas locations used by the CIA.  The defendant claimed, however, that he never responded to any of the taskings.  When confronted with the classified document the FBI obtained from the defendant's thumb drive, he admitted that he created the document in response to two taskings from the IOs.

The CIA did not rehire the defendant, and in the summer of 2013, he returned to Hong Kong. On January 15, 2018, the FBI arrested the defendant at John F. Kennedy International Airport. The defendant continued to falsely deny that he ever kept any work-related notes at home. He also falsely denied that he possessed the two notebooks while transiting through Hawaii in August 2012.

## II.   PROCEDURAL HISTORY

On May 8, 2018, a grand jury returned a true bill in an indictment charging Jerry Chun Shing Lee with conspiracy to communicate, deliver, and transmit national defense information ("NDI") to the Government of the People's Republic of China, and representatives, officers, and agents thereof, in violation of 18 U.S.C. § 794(a) & (c) (Count One); and two counts of unlawful retention of NDI, in violation of 18 U.S.C. § 793(e) (Counts Two and Three).

On May 1, 2019, the defendant appeared before the Court and entered a plea of guilty to Count One of the Indictment. Sentencing is currently scheduled for November 22, 2019.

## III.   A SENTENCE COMMENSURATE WITH THE GUIDELINES IS APPROPRIATE

### A.   Applicable Law and Guidelines Calculation

The advisory guidelines range, as calculated pursuant to the U.S. Sentencing Guidelines ("USSG") is not binding upon the Court and instead constitutes a "starting point and initial benchmark" in the sentencing analysis. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Nonetheless, "a court of appeals may apply a presumption of reasonableness to a sentence imposed by a district court within a properly calculated guideline range . . . ." United States Sentencing Commission, *Guidelines Manual*, at 14 (citing *Rita v. United States*, 551 U.S. 338 (2007)). After ensuring that the advisory guideline range is properly calculated, the Court must consider whether a sentence within that range serves the factors and purposes set forth in 18

U.S.C. § 3553(a).  *See United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006).  If it does

not, the Court must determine whether grounds for a departure exist under the guidelines or

pertinent case law and apply them, as appropriate.  *Id.*; *see United States v. Tucker*, 473 F.3d

556, 560-61 (4th Cir. 2007) (consider departure ground before imposing variance).  If, following

that analysis, the Court still deems a sentence within the advisory guidelines range to be

inadequate, the Court may further vary, above or below, that advisory range until it reaches a

sentence that best serves the statutory sentencing factors and purposes.  *See Moreland*, 437 F.3d

at 432.  Finally, the Court must state its reasons for imposing such a sentence, taking care to

explain the reasons for any departure or variance.  *Id.  See also* 18 U.S.C. § 3553(c)(2).

In this case, the probation officer properly calculated that the defendant's sentencing

guidelines range is 262-327 months of imprisonment.  The base offense level of 37 is based on

Lee's conviction for conspiring to transmit United States government NDI, classified at the

SECRET level.  USSG § 2M3.1.  With a two-level decrease for acceptance of responsibility

(USSG § 3E1.1(a)) and two two-level increases, one each for abuse of a position of trust (USSG

§ 3B1.3) and obstruction of justice (USSG §3C1.1), the resulting offense level is 39.  The

defendant has no criminal history.

The probation officer properly included an enhancement for abuse of a position of trust.

The defendant used information he obtained while working in a sensitive government position.

This Court and the Fourth Circuit have previously applied the abuse of position of trust

enhancement in similar circumstances.  *United States v. Mallory*, Case No. 1:17-cr-154 (E.D. Va.

2019) (Ellis, J.); *United States v. Pitts*, 973 F. Supp. 576, 584 (E.D. Va. 1997) (Ellis, J.)

(increasing abuse of position of trust enhancement by one additional level for former FBI agent

convicted of violating 18 U.S.C. § 794 who "held a special position of awesome responsibility

and trust [and] was supposed to safeguard this nation from foreign espionage activity" but who "[i]nstead . . . betrayed his country by engaging in the very activity that he was sworn to protect the nation against"), *aff'd*, 176 F.3d 239, 245 (4th Cir. 1999) (affirming district court's enhancement where "abuse of trust was extraordinary"); *see United States v. Ford*, 288 F. App'x. 54, 61 (4th Cir. 2008) (finding no error in application of abuse of position of trust enhancement for 18 U.S.C. § 793 conviction because defendant's "abuse of his position of public trust contributed significantly to his commission of the offense.  [The defendant] simply would not have been able to commit the offense of retaining classified documents without permission if he had not held a top secret security clearance. . . .").

The probation officer also properly concluded that the defendant obstructed justice.   The guidelines provide for a two-level enhancement where "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct."  USSG § 3C1.1.  In this case, the defendant repeatedly made false statements to members of the CIA and FBI to thwart the investigation.

Examples of the defendant's false statements are spelled out in the PSR and the statement of facts.  *See* PSR, ¶¶ 50-54; Statement of Facts, ¶¶ 10, 11(a), 13(b), 15, 16, 16(a), 20.  The defendant lied during ten ruse re-hire interviews at the CIA in 2012.  He made false statements about, *inter alia*, the circumstances of how he was approached by PRC IOs, whether he had received taskings from the IOs, whether the IOs had paid him, and whether he still possessed classified information from his time at the CIA.

The defendant also submitted a falsified bank statement to the CIA.  The bank statement purported to show that the defendant's company was profitable, providing the defendant with a cover story for the funds he was receiving from the PRC.  The defendant continued to lie during five meetings with FBI agents in 2013 and during his pre-arrest interview at John F. Kennedy International Airport in January 2018.  Application of the obstruction of justice enhancement is appropriate.

In sum, the recommended sentencing guidelines range of <u>262-327 months</u> is an appropriate range in which the Court should sentence the defendant.

**B.     18 U.S.C. § 3553(a) Factors Support a Guidelines Sentence**

In addition to the guidelines range, the factors for the district court to consider at sentencing include: (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the important need for the sentence to reflect the seriousness of the crime and deter future criminal conduct; and (4) the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a).  In this case, all of these factors weigh in favor of a sentence within the advisory guideline range.

### 1.     *History and Characteristics of the Defendant*

The defendant is a 55-year-old former intelligence officer.  He was a CIA case officer— a highly trained, sophisticated intelligence professional.  From his training and time in the field, the defendant knew the information he possessed would have been of great interest to the PRC, regardless of when and where he acquired it.  The defendant also was well aware that this information would place lives of former colleagues and assets at risk and would have a lasting impact on the CIA and our country's national security.

Admittedly, a great deal of evidence in this case comes from the defendant's admissions and false statements. The defendant should receive no credit for this, however. Throughout the 2012 CIA and 2013 FBI interviews, the defendant made a concerted effort to conceal the conspiracy and impair the investigation. He intentionally minimized the nature of his relationship with the Lis. The defendant was not forthcoming and only admitted inculpatory facts when confronted with an inconsistency or inexplicable fact in his story. Far from assisting the investigation or accepting responsibility, the defendant went to great lengths to prevent the United States government from learning the truth about his conduct.

2. *Nature and Circumstances of the Offense*

The essence of the crime of espionage is that a person with access to sensitive information chooses to betray the United States and advantage a foreign nation. Where, as here, the defendant possessed information about human sources and operational activity, the offense is particularly serious. Jerry Lee put human lives at risk for his own financial gain. He then lied repeatedly and egregiously about his conduct. The nature and circumstances of the offense amply demonstrate why a guidelines sentence is appropriate.

As mentioned above, the conspiracy began in April 2010, when members of the MSS offered the defendant money in exchange for information from his time at the CIA. From May 2010 to December 2013, the PRC paid the defendant approximately $841,997.47 in cash. *See* PSR, ¶¶ 29, 46. At the same time, the defendant sought reemployment with the CIA, which would have gained him access to additional sensitive information. The defendant told his CIA interviewers that he hoped that he could resume working against the China target. Had he been able to secure such a position, the defendant would have immensely enhanced his value to the PRC and likely caused even more significant harm to the nation.

10

The duration of the conspiracy and the receipt of over $840,000 the defendant received demonstrate that the PRC viewed the defendant as a high-performing, valuable asset.  It is a reasonable inference that, at minimum, the defendant provided the PRC with most, if not all, of the classified information in his physical possession – either directly or indirectly through his handling of the material.  The two notebooks the defendant retained contained "handwritten notes concerning sensitive human sources," as well as "the names and locations of covert CIA officers and facilities, the true names of assets, operational notes from asset meetings, the locations of operational meetings and other sensitive intelligence collected by the CIA."  *Id*. at ¶¶ 38, 44, 45.  These notebooks should never have left the custody of the CIA let alone been stored in Hong Kong and travelled with internationally.  With even just a small amount of information from the notebooks, the PRC could have identified CIA clandestine human sources, employees, and operations.  Indeed, any person who has had more than passing contact with the CIA employees in the notebooks could fall under suspicion of the intelligence services of the PRC and other hostile nations.

As recounted in the Statement of Facts, on May 26, 2010, the defendant created on his laptop a document that described locations to which the CIA would assign officers with certain experience, as well as the particular location and timeframe of a sensitive CIA operation. Statement of Facts, ¶ 13.  This document also placed at risk CIA operations, employees, and clandestine human sources.  After creating the document, the defendant transferred it from his laptop to a thumb drive.  *Id*.  The defendant created this document *in response to two taskings from the PRC IOs*.  *Id*. ¶ 13(c).  It is all but certain he provided the information contained therein to them.

Admittedly, the government did not catch the defendant in the act of passing information to the PRC. However, this underscores the fact that we can never be sure of exactly how much information he disclosed. The defendant should not benefit because he was able to sustain a clandestine relationship with a foreign adversary and conceal it from investigators.

In sum, the nature and circumstances of the offense, including the risk of harm to CIA operations, employees and assets, justify a significant sentence.

3. *Need to Reflect Seriousness of Offense and Deter Future Criminal Conduct*

The conspiracy offense to which the defendant pled guilty is among the most serious crimes in the Federal Code. This reflects a considered judgment on the part of Congress to forcefully punish individuals who betray this nation. Therefore, the statutory penalty is up to life in prison, and if "the offense resulted in the identification by a foreign power . . . of an individual acting as an agent of the United States and consequently in the death of that individual," this is a death eligible offense. The guidelines also reflect the seriousness of this offense. Simply put, espionage is a serious crime that deserves a lengthy sentence of imprisonment.

General deterrence counsels in favor of a sentence within the guidelines range. In any espionage case, a lengthy sentence is appropriate to deter clearance holders from disclosing classified information. Former clearance holders who live abroad create a particularly acute risk to national security. This risk increases exponentially where the clearance holder works or lives in China, one of the leading state intelligence threats to the United States. *See* Daniel R. Coats, Director of National Intelligence, *Worldwide Threat Assessment of the US Intelligence Community* (Jan. 9, 2019). The PRC intelligence services can leverage state-control over enterprise to extract information from persons such as the defendant who seek to do business in China. The PRC is a difficult environment for U.S. counterintelligence investigators. As a

12

result, the defendant and former clearance holders who are similarly situated are particularly

appealing targets.  A lengthy sentence is needed to deter these people from betraying their

country for the lucrative rewards China offers.

As for specific deterrence, it is highly likely the defendant will return to Hong Kong after

he finishes serving his sentence.  He was employed and resided there at the time of his arrest.

The defendant's wife and most of their extended families live in Hong Kong.  The defendant has

few ties to the United States and no longer owns property here.  A lengthy sentence is the only

way to ensure that he will not attempt to convey additional NDI to the PRC upon his release.

4.      *Avoidance of unwarranted sentencing disparities*

A final sentencing factor to consider is the "need to avoid unwarranted sentencing

disparities among defendants with similar records who have been found guilty of similar

conduct."  18 U.S.C. § 3553(a)(6).  A review of similar cases reflects the fact that espionage

convictions are dealt with seriously, and defendants who commit these offenses serve lengthy

terms of imprisonment.

*United States v. Brian Patrick Regan*, 1:01-CR-405 (E.D. Va. 2003) (Lee, J.), involved a

defendant in the Eastern District of Virginia convicted of violating section 794.  Regan was a

member of the U.S. Air Force who, between mid-1999 and August 2001, while working at the

National Reconnaissance Office, obtained classified intelligence related to the military

preparedness of Iran, Libya, Iraq, and the People's Republic of China.  Regan attempted to sell

this TOP SECRET information to Iraq, Libya, and the PRC.  *United States v. Regan*, 228 F.

Supp. 2d 742, 745 (E.D. Va. 2002).  Following his conviction at trial for two counts of attempted

espionage in violation of section 794(a) and one count of obtaining information respecting the

national defense of the United States with intent to cause injury to the U.S. and advantage to a

foreign country in violation of section 793(b), Regan was sentenced to life in prison.  This life sentence represented a sentence within the guidelines.

*United States v. Pitts*, 973 F. Supp. 576 (E.D. Va. 1997) (Ellis, J), involved another defendant in the Eastern District of Virginia convicted of violating section 794.  Pitts "betrayed his country by becoming an agent of the KGB," and by passing "unclassified and classified material to his KGB and SVRR 'handlers,'" for which he was paid at least $129,000.  *Id*. at 577-78.  Pitts was also the subject of a "false flag" operation[1] where he provided additional information to those he believed to be Russian contacts, but who were, in fact, "undercover FBI agents pretending to be SVRR officers."  *Id*. at 578.

The Court found that the guidelines range for Pitts was 262-327 months.  Even though the defendant pled guilty, the Court sentenced him to near the top of that range – 324 months in prison.  *Id.* at 584.  In imposing sentence, the Court noted that Pitts had abused a position of trust because he was "a supervisory special agent of the FBI" and "a foreign counterintelligence operative."  *Id*. at 583.  The Court noted that Pitts's rationalizations for committing those offenses were "indefensible; none abrogates Pitts's moral and legal duty not to betray his country." *Id*. at 585.

In *United States v. Hoffman*, 2:12-cr-184 (E.D. Va. 2014) (Doumar, J.), the defendant, a former cryptologic technician with the U.S. Navy, divulged classified information to undercover FBI agents posing as Russian intelligence officers after expressing his desire to be compensated in the form of job assistance or payments.  In response to undercover agents' questions, Hoffman provided written responses that contained NDI classified at the levels of SECRET and TOP

---

[1]  A false flag operation is this context is when a criminal target is engaging with an undercover law enforcement officer posing as a member of a foreign intelligence service.

SECRET/SCI.  Following a five-day trial, a jury convicted Hoffman of one count of attempted espionage, in violation of section 794(a).  Under USSG § 2M3.1, Hoffman's offense level was 42, which resulted in a guidelines range of 360 months to life imprisonment.  Hoffman was sentenced to 360 months.

More recently, this Court sentenced Kevin Patrick Mallory to twenty years of imprisonment.  *See* Case No. 1:17-cr-154 (E.D. Va. 2019) (Ellis, J.).  Although Mallory's conspiracy involved TOP SECRET information, several facts suggest that Lee's conduct is far more serious and deserving of a sentence at least as long, if not longer, than Mallory's.  First, Mallory's conspiracy lasted only a few months, and he only traveled twice to meet with PRC IOs.  Mallory received a total of only $25,000 from the PRC.  Mallory was only interviewed twice by US investigators.

By contrast, and as detailed above, this conspiracy lasted for a number of years.  This defendant likely had numerous meetings with PRC IOs, and he received approximately $840,000 from them—some 33 times the value of the funds Mallory received.  Moreover, as discussed above, the defendant formerly worked for the CIA in a position where he was privy to highly sensitive and damaging information about CIA tradecraft intended to protect intelligence activities from identification by hostile foreign powers, details of CIA training tradecraft, the identities of clandestine human assets, and the identities of covert CIA officers.  Finally, while attempting to gain access to additional NDI by reapplying to the CIA, the defendant repeatedly and egregiously lied to former colleagues and CIA interviewers as well as FBI agents who were investigating his conduct.  Give these facts, it is very likely that the defendant provided the PRC with a great deal more information than Mallory did.  Under these circumstances, a sentence at least as long as Mallory's, if not significantly longer, is appropriate.

15

This case is also distinguishable from that of Ron Rockwell Hansen, who was recently sentenced in the District of Utah.  Hansen, a former Defense Intelligence Agency ("DIA") case officer, pled guilty to one count of *attempted passage* of NDI, in violation of section 794(a).  *See United States v. Ron Rockwell Hansen*, ECF No. 66, Docket No. 1:18-cr-0057-DB (D. Ut. Mar. 15, 2019).  Hansen admitted that the PRC began targeting him in 2014 and that he provided them with unclassified information he gathered for them at conferences and through other sources.  *Id.* at 3.  Hansen further admitted that he solicited information from a former colleague that he knew the PRC would find valuable.  *Id.*  That former colleague reported Hansen's conduct to the DIA. With the cooperation of DIA and the FBI, the former colleague procured NDI, classified at the SECRET level, for Hansen.  *Id.* at 4.  Hansen met with the former colleague, reviewed the NDI, and was arrested prior to boarding the flight.  *Id.*  The parties agreed to a sentencing range of ten to fifteen years, and the court sentenced Hansen to ten years.

The government is prepared to address Hansen's case more fully at the time of sentencing.  On its face, however, Hansen is easily distinguishable.  Hansen was convicted of an attempt, and he did not admit to obstructing justice or making false statements to investigators. Although Hansen admitted receiving hundreds of thousands of dollars from the PRC, all of that money predated the NDI he attempted to disclose that formed the basis of the charged conduct.

In sum, the defendant's conduct is more serious than that of Regan, Pitts, Hoffman, and Hansen.  It is also arguably more serious than that of Mallory, who was sentenced to 20 years of imprisonment.  Therefore, a guidelines sentence in this case is appropriate to avoid unwarranted sentencing disparities.

## III.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence the defendant to a significant term of imprisonment within the recommended guidelines range of 262-327 months.  Such a sentence not only comports with the USSG calculation, but also appropriately reflects the seriousness of the offense and the great risk of harm the defendant created not only for this country, but also for specific human assets who selflessly put their own safety at risk for the protection of the United States' national defense.

Dated:  November 15, 2019                      Respectfully submitted,

                                                                G. Zachary Terwilliger
                                                                United States Attorney

                                               By:    _____/s/_____
                                                                W. Neil Hammerstrom, Jr.
                                                                Assistant United States Attorney
                                                                United States Attorney's Office
                                                                2100 Jamieson Avenue
                                                                Alexandria, VA  22314
                                                                Tel: (703) 299-3700
                                                                Fax: (703) 299-3982
                                                                Email:  neil.hammerstrom@usdoj.gov

                                                                Adam L. Small
                                                                Trial Attorney
                                                                United States Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the  15th  day of November 2019, I filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send an electronic notification to all

counsel of record.

_____/s/_____
W. Neil Hammerstrom, Jr.
Assistant United States Attorney

18