**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) | |
| vs. | ) ) | Case No. 1:18-cr-89 (TSE) |
| **JERRY CHUN SHING LEE,** | ) ) ) | |
| **Defendant.** | ) ) | |

**JERRY CHUNG SHING LEE'S**
**MEMORANDUM IN AID OF SENTENCING**

## I.   INTRODUCTION

On November 22, 2019, Jerry Chung Shing Lee, a 55 year-old former intelligence officer with no prior criminal record, will appear before this Court to be sentenced, on his plea of guilty, to Count One of a three count Indictment. (Dkt. 27 ). Count One charged Mr. Lee with violating 18 U.S.C. §§ 794(a) & (c) which proscribes entering into a Conspiracy to Gather or Deliver National Defense Information to Aid a Foreign Government. The maximum penalty for this offense is life imprisonment, a fine of $250,000, $100 special assessment fee and five years of supervised release. The remaining two counts charging Mr. Lee with Unlawful Retention of National Defense Information in violation of 18 U.S.C. § 793(e) were dismissed. The Indictment does not allege that Mr. Lee attempted to transmit or actually transmitted national defense information to a foreign government, namely the People's Republic of China.

The issue for the Court to decide is what sentence is "sufficient, but not greater than necessary" to satisfy the purposes of federal sentencing as set forth in 18 U.S.C. § 3553 (a). It is

respectfully submitted that a sentence of 120 months of active incarceration is the appropriate sentence in this case.

As described below and in the Presentence Report, Mr. Lee has no prior criminal record, but has a record of serving this country and the CIA honorably for twenty years. Although he initially lied to investigators for the CIA and FBI, Mr. Lee accepted responsibility for his conduct by entering a timely plea of guilty. In doing so, he admitted that he conspired to deliver national defense information ("NDI") to the Chinese Security Services ("MSS") that was classified at the Secret Level.[1] (Dkt. 168, p. 1). He did not admit and the government did not prove as argued in its Position with Respect to Sentencing, that "in exchange for conspiring with intelligence officers of the People's Republic of China and providing them with sensitive national defense information, the defendant received over $840,000." (See G's POS, Dkt. 184, p. 1).

For the reasons stated below, the Court should sentence Mr. Lee to a term of 120 months imprisonment.

## II. APPLICABLE LAW AND GUIDELINE CALCULATIONS

The Probation Office has calculated Mr. Lee's Total Offense Level at 39 with a criminal history Category of 1. The guideline calculation includes a two-level enhancement for abuse of position of trust pursuant to U.S.S.G. § 3B1.3, and a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. As such, the advisory guideline range calls for a sentence of 262 to 327 months.

An adjustment under § 3B1.3 is warranted "if the district court determines that [the

---

1 References in the Presentence Report to at least one instance of information in the 2002 Day Planner classified at the Top-Secret level is not supported by the Statement of Facts or Mr. Lee's guilty plea. (See PSR ¶¶ 44-45, Dkt. 179, p. 11). This Court should disregard that statement in fashioning an appropriate sentence.

defendant] abused a position of trust and that abuse significantly contributed to the commission or concealment of the crime." *United States v. Ebersole,* 411 F.3d 517, 536 (4th Cir. 2005) (internal quotation marks and citations omitted).  The defense is mindful that in the *Mallory* case, the Court found the two-level enhancement appropriate but urges the Court not to find the enhancement applicable here.  Alternatively, the Court should revisit the issue of the abuse of trust enhancement when it determines Mr. Lee's sentence pursuant to § 3553(a).

Regardless, Mr. Lee objects to the abuse of trust enhancement because he was no longer a CIA employee at the time of the offense and no longer occupied a position of public trust within the intelligence community.  He also objects because the offense characteristics of § 794(a) and (c) already incorporate the element of abuse of trust.  Mr. Lee would not have been able to commit the offense of conspiracy to transmit national defense information if he had not formerly held a security clearance as an employee of CIA and then was entrusted with that information as part of his job.

The Fourth Circuit has identified several factors that a district court should consider in determining whether a defendant held a position of trust, among them an examination of "the acts committed to determine whether this defendant is 'more culpable' than others who hold similar positions and who may commit crimes."  *United States v. Glymph,* 96 F.3d 722, 727 (4th Cir.1996) (citation omitted).  Notably, Mr. Lee's access to classified information terminated when he resigned from the CIA in 2007, a full three years before he was pitched by the MSS.  And, as argued above, the offense cannot be committed without access to national defense information which access would thus be common to all defendants who commit the same crime.

It is also important "to inquire into the level of harm occasioned by the breach of trust."

3

*United States v. Pitts,* 176 F.3d 239, 246 (4th Cir.1999). The government repeatedly informed the defense that no damage assessment existed or would be performed related to this case, which precludes the Court from properly making or resolving this inquiry and the Government has posited no direct evidence that Mr. Lee actually caused any harm to the United States.

This Court could thus reasonably find that Mr. Lee is not "more culpable" than any other defendant who held a similar position and who may commit a similar crime. The Court could also find that the degree of harm was speculative and thus not extraordinary. Without the two-level enhancement, Mr. Lee's total offense level is 37 with a corresponding advisory guideline range of 210 to 262 months. Regardless, either guideline range would result in a sentence that is far greater than necessary to satisfy the purposes of federal sentencing laws.

Mr. Lee also submits that a guidelines sentence for Count 1 is substantively unreasonable because it overstates the nature and seriousness of his offense conduct and creates an unwarranted sentencing disparity between Mr. Lee and other similarly-situated defendants. In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court rejected the government's argument that sentences outside of the advisory guidelines range should be subjected to exacting scrutiny on appeal, because, in part, the guidelines are only one of the factors the court should consider when imposing a sentence. As the Court explained, the calculation of the guidelines sentencing range is just the "starting point and the initial benchmark" from which sentencing courts should begin to make their sentencing determinations. *Id*. at 49. That is because courts must consider the advisory guidelines as just one of seven co-equal statutory sentencing factors enumerated in 18 U.S.C. § 3553 (a)(1)-(7). *United States v. Booker*, 543 U.S. 220, 259-60 (2005). Of those seven factors, the most important for purposes of this case are the nature and circumstances of the offense and

4

the characteristics of the defendant, the kinds of sentences available, and the need to avoid unwarranted sentencing disparities.

Upon consideration of those factors, this Court should find that this case falls outside of the "heartland" contemplated by the guidelines, because either "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). While the Court must begin its analysis with a calculation of the advisory guidelines sentencing range, the sentencing court is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence. This is because the Court, consistent with *Rita*, is free to disagree, based on the entirety of the § 3553 sentencing factors, with the U.S.S.G.'s "rough approximation" of the appropriate sentence in a given case. In the end, the primary purpose is to determine under § 3553 (a) what sentence is sufficient in any particular case. While the guidelines provide "categorical" guidance, this Court must consider Mr. Lee as an individual and not assume that the guidelines range yields a presumptively appropriate sentence.

### III.   18 U.S.C. § 3553(a) SUPPORTS A TEN YEAR SENTENCE

In addition to the Guidelines, 18 U.S.C. § 3553(a), requires the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law and provide just punishment. The sentence should also reflect the need for adequate deterrence to criminal conduct and protection of the public from further crimes by the defendant. 18 U.S.C. §§ 3553 (a)(2)(A), (B), (C) and (D). Lastly, the Court should not impose a sentence that results in unwarranted disparities among similarly situated defendants.

Mr. Lee's personal background, his lack of criminal history and his years of exceptional service to the CIA, all favor a lenient sentence. The Probation Officer correctly concluded that although the defendant received an enhancement for obstruction of justice, this was the "extraordinary case" where the defendant should also receive acceptance of responsibility. PSR ¶ 56, Dkt. 179, p. 14. There is no doubt that Mr. Lee recognizes the seriousness of the crime to which he has pled guilty and has accepted responsibility for his actions. There is also no doubt that his public conviction and a 120-month sentence will adequately deter Mr. Lee from committing future crimes and meet the need for deterrence in general.

### A.     Mr. Lee's Personal History and Characteristics

Mr. Lee was born in Hong Kong in 1964. He emigrated to Hawaii with his family in 1979. After graduating high school, Mr. Lee served in the U.S. Army from 1982 until 1986 and in the Army Reserves from 1986 to 1988, receiving honorable discharges as an E4 and E5. In 1986, Mr. Lee returned to Hawaii to attend college. He graduated from college in 1993 and moved to Virginia to begin work at the CIA as a case officer in 1994 where he was employed until he retired in 2007. Mr. Lee received Exceptional Performance Awards for his work at the CIA in 2000, 2003, and, 2004, and two in 2005. He became a naturalized United States citizen on September 26, 1984. His parents and siblings are all naturalized U.S. citizens and hold dual citizenship in Hong Kong and the United States.

Mr. Lee is married to Carol Lee. Together, they have two daughters. Mr. Lee's wife and daughters are also naturalized U.S. citizens and hold dual citizenship in Hong Kong and the United States. His oldest daughter graduated from college in the United States in 2018 while Mr. Lee was awaiting trial. She currently resides with Mr. Lee's wife in Hong Kong and is employed at

Hyatt.  His youngest daughter is a sophomore at Virginia Polytechnic Institute.  As reported by the Probation Officer, Mr. Lee shares a very close relationship with his family and has just learned that his mother is in the early stages of degenerative brain disease.  (Letter from Stella Chan, Nov. 5, 2019)

The letters that the Court has received from his family show how loved and respected Mr. Lee is by his family.  His parents write that Jerry is a loving and supportive son.  (Letter from Yuet Yuen Lee and Bing Shu Lee, July 20, 2019)  His wife writes of her love for her husband and all the sacrifices the family made while Mr. Lee traveled the world with young children while on assignment for the CIA and how Mr. Lee's primary concern in life was for his parents, his wife and his children.  She says that Mr. Lee's actions have changed her life forever. (Letter from Caroline Lee, May 12, 2019)  His daughters miss him terribly and want the Court to know that they love their father unconditionally and hope for his eventual release and for the reunification of their family.  (Letter from Elizabeth Lee, June 15, 2019 and Christina Lee, April 28, 2019) Counsel is well aware of how closely the Court reviews letters from family and other acquaintances of anyone who is being sentenced and will not summarize all of them.   The main point is that Mr. Lee is a man who is loved and respected by his family and friends who remain loyal to him even in the face of Mr. Lee's plea to such a serious charge.

**B.     The Nature and Circumstances of the Offense**

As recounted in the Statement of Facts, Mr. Lee was hired by the CIA in 1994.  He worked as a case officer at various overseas locations, including in China.  He maintained his official cover after retiring in 2007 until reports of his CIA employment were made public by the government following his arrest in January 2018.

7

In July 2007, Mr. Lee began working for JTI, an international tobacco company in Hong Kong. He was terminated from JTI in 2009 but continued to receive salary payments until May 2010. In 2009, Mr. Lee began discussing forming a new business with a business associate who he knew to be a former Hong Kong police officer with ties to the China's State Tobacco Monopoly Administration ("STMA") and Ministry of State Security ("MSS") in China. The business was intended to serve as an intermediary between foreign tobacco companies and the STMA. (SOF ¶¶ 6-7, Dkt. 169, p. 2). Mr. Lee and his business associate registered the company, FTM International ("FTM"), in June 2010. (SOF ¶ 14, Dkt. 169, p. 5). When forming the company, Mr. Lee and his business associate agreed that the business associate would perform all of the company's work in China.

On April 26, 2010, Mr. Lee and his business associate traveled to Shenzhen, China to attend a private dinner arranged by the business associate. The dinner was attended by two MSS intelligence officers ("IOs"). After the business associate excused himself from the table, the intelligence officers offered to compensate Mr. Lee in exchange for national defense information from his time as a CIA case officer. The IOs offered to pay Mr. Lee $100,000 and take care of him for life. On May 11, 2010, Mr. Lee reported the pitch to a former CIA colleague but failed to reveal the IOs' request for information or offers of payment. (SOF ¶¶ 9-10, Dkt. 169, p. 3).

From approximately April 26, 2010 until January 15, 2018,[2] Mr. Lee conspired with representatives of the Government of the People's Republic of China to deliver information relating to the national defense of the United States classified at the Secret. In May 2010, Mr.

---

2 The 2018 date is the date of Mr. Lee's arrest which the Government maintains was the date the conspiracy would have ended as a matter of law. As the Court can see from the Statement of Facts, there is no evidence of contact with the MSS after February of 2013.

8

Lee began to receive a series of taskings from the IOs that asked him to reveal sensitive information about the CIA, including national defense information. The taskings continued into at least 2011. (SOF ¶ 11, Dkt. 169, p. 3).

In May of 2010, Mr. Lee deposited approximately $17,000 in cash into his bank account. This deposit was the first of approximately $840,000 (USD equivalent) in cash deposits the defendant made or caused to be made into his personal HSBC from this date through December 2013. (SOF ¶ 12, Dkt. 169, p. 4).[3]

On May 26, 2010, Mr. Lee created a document on his laptop that described, *inter alia*, "certain locations to which the CIA would assign officers with certain identified experience, as well as the particular location and timeframe of a[n unspecified], sensitive CIA operation." After creating the document, Mr. Lee transferred it from his laptop to a thumb drive. The FBI forensically imaged the thumb drive and later located the document in the unallocated space of the thumb drive, meaning it had been deleted. (SOF ¶ 13, Dkt. 169, p. 4-5).

When confronted with the document in May 2013 by Special Agents of the FBI, Mr. Lee first falsely denied possessing or deleting the document. He later admitted that he had created the document in response to two taskings for the IOs and transferred it to a thumb drive. He also told the agents that "he thought about giving it to the IOs but never did." It was later determined that at least some of the information in the document was national defense information that was classified at the Secret level. (SOF ¶ 13, Dkt. 169, p. 5). In the summer of 2010, Mr Lee also drew a sketch of the floor plan of a CIA facility overseas that was no longer in use. Mr. Lee admitted that he created the drawing during an FBI interview on May 31, 2013. During that

---

3 The government has not been successful in linking the deposits to the IOs or to the provision by Mr. Lee of any information to the Chinese.

interview, he also stated that "he tore it up, threw it away, and never gave it to the IOs." (SOF ¶ 15, Dkt. 169, p. 6).

In early 2012, Mr. Lee submitted an application to the CIA for rehire at the urging of his former CIA colleague as part of a ruse to lure him to the United States for questioning. In March and June 2012, Mr. Lee traveled to the United States for interviews in conjunction with his purported application for reemployment with the CIA. Mr. Lee made numerous false statements to conceal the conspiracy during these interviews, but made no attempt to elicit classified information from any of his former colleagues or interviewers with whom he met over the course of the interviews. Mr. Lee had additional interviews with the CIA in December 2012 during which he provided a partially false narrative account of his encounter with the OIs. He also admitted receiving taskings from the IOs, but omitted other inculpatory facts.

In April 2010, a Yahoo! email account was created from an IP address in Guangzhou, China. The account's user name related to one of Mr. Lee's close family members. (SOF ¶19, Dkt. 169, p. 7). On February 9, 2013 an email was posted in the email account. The subject of the email was "How's christina?" The message read:

"Long time no see, How's christina's grade book ?

We have not seen her recent grade book for a few months, maybe [sic] little girls always like changing her mind."

(SOF ¶19, Dkt. 169, p. 7). The account had been accessed from China. The government is not alleging that Mr. Lee accessed this account. (SOF ¶19, Dkt. 169, p. 7).

In July or August 2013, Mr. Lee moved with his family from Hong Kong to Northern Virginia. The FBI searched his hotel room on August 13, 2012 pursuant to a court-ordered search warrant. The thumb drive, a 2002 Day Planner and an address book were found among his

10

personal belongings. The two books contained handwritten notes made by Mr. Lee between 2002 and 2005, including personal information such as banking and password information. The preponderance of the notes related to his work as a CIA case officer prior to 2004 in countries other than China that was consistent with his CIA cover. The notes also included cryptic references to intelligence provided by CIA assets, true names of assets, cryptic references to operational meeting locations and phone numbers, and information about covert facilities that CIA analysts were only able to decipher after months of mining the contents of classified cables dating back to 2002. Mr. Lee knew that many of these entries were classified up to the Secret level and contained national defense information of the United States. (PSR ¶ 18, Dkt. 169, p. 7).

Mr. Lee denied ever showing or transmitting the information in the two books to the IOs. He also denied giving them the sketch of the old CIA floor plan or the deleted document on the thumb drive. The government would nevertheless have this Court infer from the large cash deposits and the length of the conspiracy that "it is all but certain" that Mr. Lee provided the PRC with "most if not all of the classified information in his physical possession" – meaning the thumb drive and two notebooks. (Gov't. POS, Dkt. 184, p. 11). Mr. Lee made no such admissions and the government has offered only conjecture as a basis for these claims. This Court should decline the government's invitation to speculate when determining an appropriate sentence in Mr. Lee's case. Had the Government ever possessed proof that Mr. Lee gave any classified information to the Chinese, it certainly would have charged him with actual transmission of national defense information.

## C. The Need to Avoid Unwarranted Disparities in Sentencing

Mr. Lee's sentence should also be fashioned to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). The two most similar and recent espionage cases are *United States v. Kevin P. Mallory*, No 1:17-cr-00254 (E.D.Va.) (Ellis J.) and *United States v. Ron Rockwell Hansen*, 1:18-cr-00057 (D. Utah.). Both cases involve conspiracies or attempts to deliver or transmit national defense information to the intelligence services of the PRC at the Secret or Top Secret level.

In July 2017, a grand jury indicted Kevin Mallory with conspiracy to deliver, delivering and attempting to deliver national defense information to MSS, classified at the Top Secret level and with one count of making a false statement. Between 1981 and 2012 Mallory worked for various U.S. government agencies and cleared defense contractors, and spent several periods of time on active duty in the U.S. Army. During much of that time, Mallory held a Top Secret security clearance. Mallory is fluent in Mandarin Chinese. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 34, p. 2).

Mallory was originally convicted after an eight-day trial on all counts. This Court subsequently granted, in part, Mallory's Rule 29 motion and ordered an acquittal on Counts 2 and 3 charging transmission of NDI and attempted transmission of NDI for lack of venue. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 201). At sentencing, the government argued successfully that the conduct underlying the dismissed counts was something the Court can and should consider in determining Mallory's sentence. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 201, p. 2, n.1). A recitation of the evidence in the trial record is set out in this Court's Memorandum Opinion on Mallory's Motion for Judgment of Acquittal. (*United States v.*

*Mallory*, No. 1:17-cr-00154, Dkt. 202). The classified information in Mallory's case was classified at the Secret and Top Secret level and included information about a human asset operation that the government claimed "jeopardized the safety of actual human assets" – something that never occurred in Mr. Lee's case. (*United States v. Mallory,* No. 1:17-cr-00154, Dkt. 211, p. 15).

In its Position with Respect to Sentencing, the government argued that Mallory put this country and human lives, including the lives of actual assets, at risk in ways that Mr. Lee had not. Mallory then lied about his actions and took steps to conceal them. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 211, p. 9). Specifically, the government argued that Mallory presented himself on social media in a way that would make it clear to foreign intelligence services that he had been a member of the U.S. intelligence community, making it no surprise that Chinese IOs targeted him for potential recruitment. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 211, p. 10). Mr. Lee , on the other hand, maintained his official cover after retiring in 2007 until reports of his CIA employment were made public by the government following his arrest in January 2018.

The government next claimed that Mallory took aggressive steps to advance his relationship with the Chinese IOs by traveling to the PRC on two separate occasions to make contact with the individuals he believed to be officers of a hostile intelligence service. Mallory reportedly accepted $25,000 in cash in addition to airfare, accommodations and incidentals from the Chinese IOs before the transmission of the NDI. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 211, p. 11). Mallory also took possession of a Samsung phone that was customized for his use that was intended to make his communications with the OIs unrecoverable. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 211, p. 13). The government presented evidence at

13

trial that log files on the Samsung device showed send sequences for multiple classified documents, and that Mallory's own words confirmed that he had intended to provide information about U.S. government targeting information that he said would be incredibly damaging to the U.S. government. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 211, p. 14).

In the government's words, Mallory attempted to send information that jeopardized the safety of actual human assets four separate times and attempted to send a second document captioned "Foreign County A Intelligence Service Capabilities" that contained cryptonyms that related to human assets. (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 211, p. 15). According to the CIA Information Review Officer for the CIA's Litigation Information Review Office, the information contained in the documents revealed sensitive intelligence collected by the CIA, the CIA's analysis of the intelligence it collected, and in some instances, the actual sources of the intelligence. Most troubling, Mallory "sent information about DIA human assets after he learned that those assets would be traveling to the PRC." (*United States v. Mallory*, No. 1:17-cr-00154, Dkt. 211, p. 16). On its face, Mr. Lee's offense conduct is markedly different from that of Mr. Mallory and, as such, he deserves a substantially more lenient sentence. There is no evidence that Mr. Lee put the life of any asset at risk.

A more appropriate comparison is the recent case of *United States v. Ron Rockwell Hansen* in the United States District Court for the District of Utah. Ron Hansen retired from the Army with a background in signals intelligence and human intelligence. He spoke Mandarin-Chinese and Russian. From approximately 2000 to 2006, Hansen worked as an intelligence case officer for the DIA while serving on active duty in the Army. He retired from the Army in early 2006 after more than 20 years of service. Upon his retirement, the DIA hired Hansen as a civilian

intelligence case officer. Hansen possessed a Top Secret security clearance while on active duty with the Army and while employed as a DIA civilian. (*United States v. Hansen*, No. 1:18-cr-00057, Dkt. 5, p. 5).

On June 20, 2018, Hansen was charged in a 15 count indictment with Attempting To Gather or Deliver National Defense Information to the MSS in violation of 18 U.S.C. §794(a). He was also charged with Acting as an Agent of a Foreign Government, Bulk Cash Smuggling, Structuring and Smuggling Goods from the United States. (*United States v. Hasen*, No. 1:18-cr-00057, Dkt. 5).

According to the Indictment, in early 2012, Hansen attempted to regain access to national defense information by seeking positions of employment or confidence within the U.S. intelligence community. He told the FBI that by at least early 2014, he began meeting with two MSS officers who offered him $300,000 per year in exchange for providing "consulting services." (*United States v. Hansen*, No. 1:18-cr-00057, Dkt. 5, p. 10).

Mr. Hansen entered a guilty plea to Attempting to Gather or Deliver Defense Information at the Secret level. He received a sentence of 120 months imprisonment on September 24, 2019 after the government filed a motion for downward departure based on his substantial assistance. (*United States v. Hansen*, No. 1:18-cr-00057, Dkt. 77, p. 2). In connection with his guilty plea, Mr. Hansen admitted to the following statement of facts:

> In early 2014, agents of a Chinese intelligence service targeted me for recruitment, and I began meeting with them regularly in China. During those meetings, the agents described to me the type of information that would interest Chinese intelligence. During the course of my relationship with Chinese intelligence, I received hundreds of thousands of dollars in compensation for information I provided them, including information I gathered at various industry conferences. Between May 24, 2016 and June 2, 2018, in the District of Utah and elsewhere, I solicited from an intelligence case officer working for the Defense Intelligence

15

Agency (DIA) national defense information that I knew the Chinese Intelligence services would find valuable, and I agreed to act as a conduit to sell that information to the Chinese. I advised the DIA case officer how to record and transmit classified information without detection, and I explained how to hide and launder any funds received as payment for classified information. I now understand that the DIA case officer reported my conduct to the DIA and subsequently acted as a confidential human source for the Federal Bureau of Investigation (FBI).

On June 2, 2018, I met with the DIA case officer and I received from that individual documents containing national defense information that I previously solicited. The documents I received were classified at the SECRET//NOFORN level and contained classification markings. The information related to the national defense of the United States in that it related to United States military readiness in a particular region and was closely held by the United States government. I did not possess a security clearance nor did I possess a need to know the information contained in those materials. I reviewed the documents, queried the case officer about their contents, and took written notes about the materials relating to the national defense information. The notes I took contain information that has been determined to be classified at the SECRET//NOFORN level and constitutes national defense information. I advised the DIA case officer that I would remember most of the details about the documents I received that day and that I would conceal some notes about the material in the text of an electronic document that I would prepare at the airport before leaving for China. Thereafter, agents with the Federal Bureau of Investigation arrested me while I attempted to board a flight to China. At the time of my arrest, I possessed the handwritten notes containing and relating to the classified information I received from the DIA case officer.

I intended to provide the information I received to the agents of the Chinese Intelligence Serve with whom I had been meeting, and I knew that the information was to be used to the injury of the United States and t the advantage of a foreign nation. I agree that my conduct violated 18 U.S.C. § 794(a).

(*United States v. Hansen*, No. 1:18-cr-00057, Dkt. 66, pp. 3-4).

While Hansen's sentence reflects the benefit he received from the government's downward departure motion, his conduct was aggravated in ways that Mr. Lee's was not. Mr. Hansen attempted to gain access to classified information by seeking employment in the intelligence community before he began meeting regularly with agents of the Chinese intelligence services.

16

He admitted receiving hundreds of thousands of dollars in compensation for information he provided the MSS, and admitted that he solicited and received documents classified at the Secret level from a DIA case officer containing national defense information related to U.S. Military readiness in a particular region that he intended to provide to the MSS. At the time of his arrest, Mr. Hansen also possessed handwritten notes containing the classified information. None of these factors are present in Mr. Lee's case.

### D. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Accomplish Specific and General Deterrence

A sentence of 120 months would satisfy this prong of the statute as a severe sentence which would provide both specific and general deterrence.

### IV. CONCLUSION

Mr. Lee has certainly plead guilty to a very serious charge for which he must be sentenced fairly and appropriately. That guilty plea was entered soon after this Court ruled against Mr. Lee on a substantial motion that was classified and with which this Court is surely familiar. After exercising those rights, Mr. Lee's guilty plea was entered, and he accepted full responsibility for the conspiracy crime that he committed. The Government's request for essentially a life sentence is excessive and supported only by reference to older cases involving actual espionage. In the end, all of the purposes of federal sentencing law will be served by a sentence of 120 months of active incarceration.

Dated: November 18, 2019                **JERRY CHUN SHING LEE**
                                         **By Counsel**

                                                                      /s/
Edward B. MacMahon, Jr. (VSB # 25432)
Edward B, MacMahon, Jr., PLC
107 East Washington Street
P. O. Box 25
Middleburg, Virginia 20118
(540) 687-3902
(540) 687-6366 (facsimile)
ebmjr@macmahon-law.com
*Counsel for Jerry Chun Shing Lee*

                     /s/
Nina J. Ginsberg (VSB 19472)
DiMuroGinsberg PC
1101 King Street, Suite 610
Alexandria, Virginia 22314
(703) 684-4333
(703) 548-3181 (facsimile)
nginsberg@dimuro.com
*Counsel for Jerry Chun Shing Lee*

## CERTIFICATE OF SERVICE

      I hereby certify that on November 18, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record

                                                                      /s/
Edward B. MacMahon, Jr. (VSB # 25432)
Edward B. MacMahon, Jr., PLC
107 East Washington Street
P. O. Box 25
Middleburg, Virginia   20118
(540) 687-3902
(540) 687-6366 (facsimile)
ebmjr@macmahon-law.com
*Counsel for Jerry Chun Shing Lee*